UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

x------------------------------------------------------------------------x

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA, individually and as an assignee
and subrogee of Mechanical Dynamics & Analysis, LLC,
and LEXINGTON INSURANCE COMPANY,
individually and as an assignee and subrogee of
Mechanical Dynamics & Analysis, LLC,

Case No. 07-CV-11073 (WHP)

ECF Case

Plaintiffs,

-against-

CONTINENTAL CASUALTY COMPANY,

Defendant.

x------------------------------------------------------------------------x

## ANSWER TO AMENDED COMPLAINT

Defendant Continental Casualty Company (hereinafter "Continental"), by and through its

attorneys, Carroll, McNulty & Kull LLC, hereby answers the Amended Complaint as follows:

### NATURE OF ACTION

1.      With respect to the allegations contained in Paragraph 1, Continental admits only

that a lawsuit styled *Arizona Public Service Co., et al. v. Mechanical Dynamics & Analysis, LLC*,

Docket No. CV 2005-005740, was filed on or about April 7, 2005 in the Superior Court of the

State of Arizona for the County of Maricopa by Arizona Public Service Company and its

property insurance carriers against Mechanical Dynamics & Analysis ("MD&A") (the

"Underlying Action"), and that the allegations in the Underlying Action speak for themselves.

Continental further admits that it contributed to the settlement of the Underlying Action.  Except

as expressly admitted herein, Continental denies knowledge or information sufficient to form a

belief as to the truth of the remainder of the allegations contained in Paragraph 1.

2.     With respect to the allegations contained in Paragraph 2, Continental admits that it contributed $1 million toward the settlement of the Underlying Lawsuit; denies having knowledge or information sufficient to form a belief as to the allegation that "Lexington – MD&A's primary, general-liability insurer – defended MD&A and contributed its entire, $1,000,000 policy limit to the settlement of the Underlying Action"; and expressly denies the remaining allegations contained in Paragraph 2.

3.     To the extent the allegations contained in Paragraph 3 do not refer or relate to Continental, Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations.    However, to the extent the allegations refer to Continental or characterize the National Union policy as a final tier umbrella policy, all such allegations are specifically denied.

4.     Continental denies the allegations contained in Paragraph 4 and respectfully refer all questions of law to the Court.

5.     Continental denies the allegations contained in Paragraph 5 and respectfully refer all questions of law to the Court.

## PARTIES AND JURISDICTION

6.     Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6.

7.     Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7.

8.     Continental admits the allegations contained in Paragraph 8.

9.     Continental admits the allegations contained in Paragraph 9.

10.     Continental admits the allegations contained in Paragraph 10.

2

11.    Continental admits the allegations contained in Paragraph 11.

12.    Continental admits the allegations contained in Paragraph 12.

FACTS

**The Lexington Policy**

13.    Continental admits only that Lexington issued a commercial general liability policy and that the terms and conditions of the Lexington policy speak for themselves.

14.    Continental admits only that Lexington issued a commercial general liability policy and that the terms and conditions of the Lexington policy speak for themselves.

15.    Continental admits only that Lexington issued a commercial general liability policy and that the terms and conditions of the Lexington policy speak for themselves.

16.    Continental admits only that Lexington issued a commercial general liability policy and that the terms and conditions of the Lexington policy speak for themselves.

17.    To the extent the allegations contained in Paragraph 17 do not refer or relate to Continental, Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations.   However, to the extent the allegations refer to Continental, all such allegations are specifically denied.

**The Continental Policy**

18.    Continental denies the allegations contained in Paragraph 18 as alleged, but admits that Continental issued a professional liability policy to MD&A (policy number MCE 11-397-39-67) for the policy period August 1, 2003 through August 1, 2004 (the "Continental policy"), and that the terms and conditions of the Continental policy speak for themselves.

19.    Continental denies the allegations contained in Paragraph 19 as alleged, but admits that the Continental policy has limits of liability of $5 million per claim and $5 million in the aggregate for all claims, with a $250,000 Self Insured Retention per claim.

20.    Continental denies the allegations contained in Paragraph 20 as alleged, and respectfully refers to the terms and conditions of the Continental policy, which speak for themselves.

21.    Continental denies the allegations contained in Paragraph 21 as alleged, and respectfully refers to the terms and conditions of the Continental policy, which speak for themselves.

22.    Continental denies the allegations contained in Paragraph 22 as alleged, and respectfully refers to the terms and conditions of the Continental policy, which speak for themselves.

23.    Continental denies the allegations contained in Paragraph 23 as alleged, and respectfully refers to the terms and conditions of the Continental policy, which speak for themselves.

24.    Continental denies the allegations contained in Paragraph 24 as alleged, and respectfully refers to the terms and conditions of the Continental policy, which speak for themselves.

25.    Continental denies the allegations contained in Paragraph 25 as alleged, admits that Exhibit C to the amended complaint is an August 9, 2005 letter from Janet M. Mansell Dell'Anno to Robert Coleman and John Venderhoef of Mechanical Dynamics & Analysis, LLC, and respectfully refers to Exhibit C for its contents, which speak for themselves.

4

26.    Continental denies the allegations in Paragraph 26 as alleged, and respectfully refers to the terms and conditions of the Continental policy, which speak for themselves.

**The National Union Umbrella Policy**

27.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

28.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

29.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

30.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

31.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

32.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

**The Underlying Accident and Action**

33.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33.

34.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34.

35.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35.

36.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36.

37.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37.

38.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38.

39.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39.

40.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40.

41.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41.

42.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42.

43.    Continental denies the allegations in Paragraph 43 as alleged and admits only that Lexington, National Union, and MD&A unilaterally settled the Underlying Action for $8,500,000.

44.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44.

45.    Continental denies the allegations contained in Paragraph 45.

46.    Continental denies the allegations contained in Paragraph 46 and alleged and admits that it contributed $1 million toward the settlement of the Underlying Action.

47.    Continental denies the allegations contained in Paragraph 47.

48.    Continental denies the allegations contained in Paragraph 48.

49.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49.

50.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50.

## FIRST CLAIM
### (Lexington – Indemnification from Continental)

51.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 50 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

52.    Continental denies the allegations contained in Paragraph 52.

53.    Continental denies the allegations contained in Paragraph 53.

54.    Continental denies the allegations contained in Paragraph 54.

55.    Continental denies the allegations contained in Paragraph 55.

56.    Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56.

57.    Continental denies the allegations contained in Paragraph 57.

58.    Continental admits the allegations contained in Paragraph 58.

59.    Continental denies the allegations contained in Paragraph 59 and respectfully refers all questions of law to this Court.

## SECOND CLAIM
### (Lexington – Subrogation Against Continental)

60.     Continental repeats and realleges each and every response contained in Paragraphs 1 through 59 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

61.     Continental denies the allegations contained in Paragraph 61.

62.     Continental denies the allegations contained in Paragraph 62.

63.     Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 63.

64.     Continental denies the allegations contained in Paragraph 64.

65.     Continental denies the allegations contained in Paragraph 65.

66.     Continental denies the allegations contained in Paragraph 66.

67.     Continental denies the allegations contained in Paragraph 67 and respectfully refers all questions of law to this Court.

### THIRD CLAIM
**(Lexington – Contribution from Continental)**

68.     Continental repeats and realleges each and every response contained in Paragraphs 1 through 67 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

69.     To the extent the allegations of Paragraph 69 do not relate or pertain to Continental, no response is required. Continental admits only that it acknowledged a potential duty to defend subject to the terms and conditions of the Continental policy.

70.     Continental denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70.

71.     Continental denies the allegations contained in Paragraph 71.

72.     Continental denies the allegations contained in Paragraph 72.

8

73.    Continental denies the allegations contained in Paragraph 73 and respectfully refers all questions of law to this Court.

## FOURTH CLAIM
### (Lexington – Unjust Enrichment Against Continental)

74.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 73 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

75.    Continental denies the allegations contained in Paragraph 75.

76.    Continental denies the allegations contained in Paragraph 76.

77.    Continental denies the allegations contained in Paragraph 77.

## FIFTH CLAIM
### (Lexington – Breach of Contract Against Continental)

78.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 77 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

79.    Continental denies the allegations contained in Paragraph 79.

80.    Continental denies the allegations contained in Paragraph 80.

## SIXTH CLAIM
### (Lexington – Bad Faith Against Continental)

81.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 80 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

82.    The allegations contained within Paragraph 82 of the Complaint constitute conclusions of law or statements which are improper and must be determined by the Court. However, to the extent a response may be deemed necessary, Continental denies the allegations

contained within Paragraph 82 and further states that Continental's obligations to its insured are set forth in the Continental policy.

83.    Continental denies the allegations contained in Paragraph 83.

84.    Continental denies the allegations contained in Paragraph 84.

85,    Continental denies the allegations contained in Paragraph 85.

86.    Continental denies the allegations contained in Paragraph 86.

87.    Continental denies the allegations contained in Paragraph 87.

## SEVENTH CLAIM
### (National Union – Necessity for Exhaustion of Retained Limit)

88.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 87 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

89.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

90.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

91.    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

92    Continental admits only that National Union issued a commercial general liability policy and that the terms and conditions of the National Union policy speak for themselves.

93.    Continental denies the allegations contained in Paragraph 93.

94.    Continental denies the allegations contained in Paragraph 94.

95.    Continental denies the allegations contained in Paragraph 95.

96.    Continental denies the allegations contained in Paragraph 96.

97.     Continental denies the allegations contained in Paragraph 97.

## EIGHTH CLAIM
### (National Union – Indemnification Against Continental)

98.     Continental repeats and realleges each and every response contained in Paragraphs 1 through 97 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

99.     Continental denies the allegations contained in Paragraph 99.

100.    Continental denies the allegations contained in Paragraph 100.

101.    Continental denies the allegations contained in Paragraph 101 as alleged and admits that it contributed $1 million toward the settlement of the Underlying Action.

102.    Continental denies the allegations contained in Paragraph 102.

103.    Continental admits the allegations contained in Paragraph 103.

104.    Continental denies the allegations contained in Paragraph 104.

## NINTH CLAIM
### (National Union – Subrogation Against Continental)

105.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 104 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

106.    Continental denies the allegations contained in Paragraph 106.

107.    Continental admits that it contributed $1 million toward the settlement of the Underlying Action. Continental denies the remainder of the allegations contained in Paragraph 107.

108.    Continental denies the allegations contained in Paragraph 108.

109.    Continental denies the allegations contained in Paragraph 109.

110.    Continental denies the allegations contained in Paragraph 110.

111.    Continental denies the allegations contained in Paragraph 111.

112.    Continental denies the allegations contained in Paragraph 112.

113.    Continental denies the allegations contained in Paragraph 113.

## TENTH CLAIM
### (National Union – Unjust Enrichment Against Continental)

114.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 113 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

115.    Continental denies the allegations contained in Paragraph 115.

116.    Continental denies the allegations contained in Paragraph 116.

117.    Continental denies the allegations contained in Paragraph 117.

## ELEVENTH CLAIM
### (National Union – Breach of Contract Against Continental)

118.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 117 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

119.    Continental denies the allegations contained in Paragraph 119.

120.    Continental denies the allegations contained in Paragraph 120.

121.    Continental denies the allegations contained in Paragraph 121.

## TWELFTH CLAIM
### (National Union – Bad Faith Against Continental)

122.    Continental repeats and realleges each and every response contained in Paragraphs 1 through 121 of this Answer to Plaintiffs' Amended Complaint as though set forth fully at length herein.

123.    The allegations contained within Paragraph 123 of the Complaint constitute conclusions of law or statements which are improper and must be determined by the Court. However, to the extent a response may be deemed necessary, Continental denies the allegations contained within Paragraph 123 and further states that Continental's obligations to its insured as set forth in the Continental policy.

124.    Continental denies the allegations contained in Paragraph 124.

125.    Continental denies the allegations contained in Paragraph 125.

126.    Continental denies the allegations contained in Paragraph 126.

127.    Continental denies the allegations contained in Paragraph 127.

128.    Continental denies the allegations contained in Paragraph 128.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The claims asserted by Plaintiffs are barred, in whole or in part, because the Amended Complaint fails to state facts sufficient to constitute a cause of action upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

The claims asserted by Plaintiffs are barred, in whole or in part, to the extent Plaintiffs failed to include necessary and indispensable parties in this lawsuit.

### THIRD AFFIRMATIVE DEFENSE

Any alleged coverage afforded by the Continental Policy is subject to the self-insured retentions, limits of liability and other terms and conditions contained in the Continental Policy.

### FOURTH AFFIRMATIVE DEFENSE

The claims asserted by Plaintiffs are barred to the extent that MD&A failed to comply

with conditions precedent and subsequent necessary to the existence of coverage under the Continental Policy.

## FIFTH AFFIRMATIVE DEFENSE

Any purported liability of Continental is limited by the "other insurance" provisions contained in the Continental Policy.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that it is determined that MD&A failed to disclose, concealed or misrepresented facts which were material to the risks underwritten by Continental at the time the Continental Policy was negotiated, placed or purchased.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that the amounts sought from Plaintiffs relate to a claim arising out of a wrongful act, which claim was not first made during the Continental Policy period or any applicable extended reporting period, as set forth in the Continental Policy.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs and/or MD&A have failed to mitigate the damages for which Plaintiffs is allegedly liable.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because they do not involve allegations that constitute "professional services," as that term is defined in the Continental Policy, nor do they involve allegations that constitute a "wrongful act," as that term is defined in the Continental Policy.

## TENTH AFFIRMATIVE DEFENSE

14

Plaintiffs' claims are barred because the Continental Policy excludes coverage for any claim arising out of the cost to repair or replace MD&A's faulty workmanship in any construction, erection, fabrication, installation, assembly, manufacture or remediation performed by MD&A, including any materials, parts or equipment furnished in connection therewith.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because the Continental Policy excludes coverage for any claim arising out of MD&A's alleged liability under any oral or written agreement, including but not limited to express warranties or guarantees, or the liability of others Plaintiffs assumed under any oral or written contract or agreement.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because the Continental Policy excludes coverage for any claim arising out of the design or manufacture of any goods or products which are sold or supplied by you or by others under license from MD&A.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs have made any voluntary payment, admitted liability, assumed any obligation or incurred any expense without Continental's consent.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs have breached their duty to cooperate.

### FIFTEENTH AFFIRMATIVE DEFENSE

All or part of the sums for which Plaintiffs seeks coverage may be precluded by the applicable provisions, terms, conditions, limitations and exclusions of the Continental Policy

placed at issue herein, and/or by public policy or express provision of law.

## SIXTEENTH AFFIRMATIVE DEFENSE

The rights and obligations of Plaintiffs and Continental are defined and controlled by the limits of liability, terms, exclusions, conditions and other provisions of the Continental Policy placed at issue herein. The terms, exclusions, conditions and other provisions of the Continental Policy are too voluminous to itemize as affirmative defenses, and are therefore incorporated by reference herein.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' Amended Complaint is not described with sufficient particularity to permit Continental to ascertain what other defenses (including defenses based on terms, conditions or exclusions of the Continental Policy) may exist. Continental therefore reserves the right to assert all defenses that may pertain to Continental once the precise nature of the allegations in Plaintiffs' Amended Complaint are determined.

## COUNTER-CLAIMS AGAINST
## PLAINTIFFS LEXINGTON AND NATIONAL UNION

## THE INSURANCE POLICIES

1.      Three separate insurance policies issued to MD&A are at issue in the present matter. In addition to Continental, Lexington and National Union (collectively, "AIG") also issued policies to MD&A, which were effective during the period that is relevant to the facts underlying this matter.

2.      The Continental Policy, subject to its terms and conditions, provides coverage to MD&A for damages that MD&A becomes legally obligated to pay as a result of any negligent act, error or omission in the performance of professional services that it is legally qualified to

perform for others in its practice as an architect, engineer, land surveyor, landscape architect or a construction manager. The professional liability policy issued by Continental specifically excludes from coverage damages due to the costs to repair or replace faulty workmanship in any construction, erection, fabrication, installation, assembly, manufacture or remediation performed by MD&A, including any materials, parts or equipment furnished in connection therewith.

3.      The Lexington Policy is a primary general liability policy that provides coverage to MD&A for risks that are separate and distinct from those for which the Continental Policy provides coverage. The Lexington Policy includes a "professional liability" exclusion.

4.      The National Union Policy is a commercial umbrella policy. The National Union Policy, among other types of coverage, also provides coverage for damages resulting from non-professional acts or omissions. The National Union Policy also contains a "professional liability" exclusion. The National Union Policy provides coverage to MD&A for risks that are separate and distinct from those for which the Continental Policy provides coverage.

5.      The pertinent provisions of these policies are provided below.

**A.    The Continental Professional Liability Policy**

6.      Continental issued a professional liability policy to MD&A (policy number MCE-113973967) for the policy period August 1, 2003 through August 1, 2004, with limits of liability of $5 million per claim and $5 million in the aggregate for all claims, with a $250,000 Self Insured Retention per claim (the "Continental Policy").

7.      The Coverage Agreements of the Continental Policy provide, in pertinent part:

**I.    COVERAGE AGREEMENTS**

        A.    We will pay all amounts in excess of the self-insured retention up to the limit of liability that **you** become legally obligated to pay as a result of a **wrongful act** anywhere in the world, provided that on the **inception date** on the Declarations any

officer, director, principal, partner or insuring manager did not know and could not reasonably have expected that a **claim** would be made.

8.     The Continental Policy defines certain of the terms contained in the Coverage Agreements, as follows:

## II.     DEFINITIONS

**Claim** means the receipt by **you** of a demand for pecuniary damages, naming **you** and alleging a **wrongful act**.

**Claim** also means a demand for interest on any judgment or settlement.

**Wrongful Act** means a negligent act, error or omission in the performance of **professional services** for others by **you** or any **entity**, including joint ventures, for whom **you** are legally liable.

**Professional Services** means those services that **you** are legally qualified to perform for others in **your** practice as an architect, engineer, land surveyor, landscape architect, construction manager, or as specifically defined by endorsement to this policy.

9.     The Continental Policy includes a Professional Services Endorsement (Endorsement No. 5), which revises the definition of "professional services" as set forth above:

We agree with **you** that the definition of **professional services** is revised to include the following:

**Professional services** also means those services which **you** are legally qualified to perform for others in **your** practice of:

Balancing
Testing
Management/Consulting

10.     The Continental Policy contains the following exclusions that are or may be relevant:

## III.     EXCLUSIONS

We will not defend or pay under this policy for claim or claim expenses arising out of:

18

\*     \*     \*

E.    the cost to repair or replace faulty workmanship in any construction, erection, fabrication, installation, assembly, manufacture or remediation performed by you including any materials, parts or equipment furnished in connection therewith;

F.    express warranties or guarantees;

G.    the design or manufacture of any goods or products which are sold or supplied by you or by others under license from you;

11.    Finally, the Continental Policy contains the following Condition that also is or may be relevant:

**V.    CONDITIONS**

B.    **Your** Duties If There Is A **Claim**

\*     \*     \*

If there is a **claim**, **you** must do the following:

\*     \*     \*

4.    fully cooperate with us or our designee in the making of settlement, the conduct of suits or other proceedings, enforcing any right of contribution or indemnity against another who may be liable to **you**. **You** shall attend hearings and trials, assist in securing evidence and obtaining the attendance of witnesses;

5.    refuse, except solely at **your** own cost, to voluntarily make without our approval any payment, admit liability or assume any obligation or incur any expense.

\*     \*     \*

K.    Other Insurance
If **you** have other insurance which applies to the **claim**, the other insurance must pay first. It is the intent of this policy to apply to the amount of **claim** that is in excess of the limit of liability of the other available insurance. We will not pay more than our limit of liability.

This provision does not apply if the other insurance is specifically written to apply on an excess basis over this insurance.

**B.    The AIG Policies**

12.    AIG issued two general liability policies to MD&A, both of which indisputably were operative during the period relevant to the underlying facts (the "AIG Policies"). The relevant provisions of the AIG Policies are provided below.

  **i.    The Lexington Primary General Liability Policy**

13.    Lexington issued a primary general liability policy to MD&A (policy number 0153837) for the policy period December 31, 2002 through December 31, 2003 with an Each Occurrence Limit of $1 million, a Products-Completed Operations Aggregate Limit of $1 million, and a General Aggregate Limit of $2 million (the "Lexington Policy").

14.    The Lexington Policy contains the following provisions that are or may be relevant in the context of the instant matter:

**SECTION I – COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.    **Insuring Agreement**

  a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

    (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

20

(2)     Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

15.     The Lexington Policy also contains the following Condition that is or may be relevant:

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

\*          \*          \*

**4.     Other Insurance**

If other valid and collectible insurance is available to the insured **for a loss we cover under Coverages A** [bodily injury and property damage] **or B** [personal and advertising injury] **of this Coverage Part,** our obligations are limited as follows:

**a.     Primary Insurance**

This insurance is primary except when **b.** below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then we will share with all that other insurance by the method described in **c.** below.

**b.     Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1)     That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2)     That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

\*          \*          \*

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit".  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1)    The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2)    The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in the Excess Insurance provisions and was not bought specifically to apply in excess of the limits of Insurance shown in the Declarations of this Coverage Part.

c.    **Method of Sharing**

If other insurance permits contribution by equal shares, we will follow this method also.    Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of the insurance of all insurers.

16.    The Lexington Policy includes Endorsement # 6, which provides as follows:

This insurance does not apply to "bodily injury", "property damage", "personal injury" or advertising injury arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1.    The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2.    Supervisory, inspection, architectural or engineering activities.

17.    The Lexington Policy includes Endorsement # 10, which provides as follows:

1.    This insurance does not apply to "bodily injury", "property damage",

"personal injury" or "advertising injury" arising out of the rendering of or failure to render any professional services by or on your behalf but only with respect to either or both of the following operations:

    a.    Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect, or surveyor; and

    b.    Providing or hiring independent professionals to provide engineering, architectural or surveying services in connection with construction work you perform.

2.    Subject to paragraph 3. below, professional services include:

    a.    The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    b.    Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3.    Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

**ii.**    **The National Union Commercial Umbrella General Liability Policy**

18.    National Union issued a commercial umbrella general liability policy to MD&A (policy number BE 1399693) for the policy period December 31, 2002 through December 31, 2003 with an Each Occurrence limit of $9 million, a General Aggregate limit of $9 million, a Products-Completed Operations Aggregate of $9 million, and a $10,000 Self Insured Retention (the "National Union Policy").

19.    The National Union Policy contains the following coverage grant:

**I.**    **Coverage**

We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** that takes place during the Policy Period and is

23

caused by an **Occurrence** happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

\*          \*          \*

20.   The National Union Policy also contains the following provision:

### III.   Limits of Insurance

A.   The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay regardless of the number of:

1.   **Insureds;**

2.   Claims made or **suits** brought; or

3.   Persons or organizations making claims or bringing **suits.**

\*          \*          \*

E.   **Retained Limit**

We will be liable only for that portion of damages in excess of the **Insured's** Retained Limit, which is defined as the greater of either:

1.   The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the **Insured;** or

2.   The amount stated in the Declarations as Self Insured Retention as a result of any one **Occurrence** not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other underlying insurance providing coverage to the **Insured;**

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

21.   The Schedule of Underlying Insurance referenced above specifically refers to a general liability policy, covering the policy period of December 31, 2002 through December 31, 2003, the carrier of which is "to be determined." There is no dispute that the general liability

24

policy referred to in the National Union Policy's Schedule of Underlying Insurance is the Lexington Policy.

22.     The Schedule of Underlying Insurance in the National Union Policy also includes an Auto Liability policy issued by CNA, and an Employers Liability policy issued by AIG.

23.     The Schedule of Underlying Insurance in the National Union Policy does <u>not</u> include the Continental Policy.

24.     In addition, the National Union Policy contains the following provision:

**VI.     Conditions**

\*          \*          \*

**J.**     Other Insurance

If other valid and collectible insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance.  However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

25.     Furthermore, the National Union Policy contains Endorsement No. 8, which includes the following exclusion that also is relevant:

<u>**Architects and Engineers Errors and Omissions Exclusion**</u>

This insurance does not apply to **Bodily Injury** or **Property Damage** arising out of the rendering of, or the failure to render, professional services or any error, omission or mistake of a professional nature performed by or on behalf of the **Insured**, including but not limited to:

1.     The preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications; and

2.     Supervisory, inspection or engineering services.

All other terms and conditions of this policy remain unchanged.   .

26.    Additionally, the National Union Policy contains the following professional liability exclusion:

### Professional Liability Exclusion

This insurance does not apply to **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of any act, error, omission, malpractice or mistake of a professional nature committed by the **Insured** or any person for whom the **Insured** is legally responsible.

27.    Thus, the AIG Policies provide coverage for risks that are separate and distinct from those covered under the Continental Policy. Indeed, the AIG Policies provide coverage to MD&A for general liability, specifically excluding coverage for professional liability. Conversely, the Continental Policy provides coverage to MD&A for professional liability, specifically excluding coverage for liability arising out of faulty workmanship.


### FACTUAL BACKGROUND

A.    **The Underlying Litigation**

28.    This Declaratory Judgment Action arises out of the defense and settlement of the Underlying Action, which was filed by Arizona Public Service Company ("APS") and its property insurance carriers against MD&A.

29.    APS is an Arizona corporation that generates and provides electrical power to citizens of Arizona as well as to other consumers of electrical power throughout the state. During the relevant period of time, APS owned and operated the Cholla Power Plant in Joseph City, Arizona.

30.    On or about October 23, 2001, MD&A entered into a contract with APS (the "Master Agreement").

31.    Upon information and belief, the Master Agreement was written to cover a wide spectrum of potential services to be provided to APS by MD&A on a "to be determined" basis. Accordingly, the Master Agreement was written with the anticipation that MD&A and APS would contract for individual services pursuant to subsequent purchase orders and change notices.

32.    While the Master Agreement required MD&A to obtain general liability insurance, covering personal injury, contractual liability, and products and completed operations, neither the Master Agreement nor any other agreement with APS required MD&A to carry professional liability insurance.

33.    APS submitted a purchase order to MD&A dated March 4, 2003 (the "Purchase Order"), which purported to be incorporated into the Master Agreement.

34.    MD&A acknowledged and accepted APS's Purchase Order by a written Acknowledgement Order dated March 6, 2003.

35.    Pursuant to the terms of the Purchase Order, MD&A was to perform repair and maintenance work on the Unit 3 Generator (the "generator") at the Cholla Power Plant. Upon information and belief, MD&A's scope of repair work pursuant to the Purchase Order was to install blocking in the generator (the "Initial Repair Work"). "Blocking" is intended to hold various components of the generator stationary and reduce/eliminate vibration.

36.    An electric power generator is essentially a very large magnet spinning inside a coil of wire. The principal parts of the generator are the rotor and the stator. The rotor is the magnetic cylindrical piece that occupies the axial center of the generator from end to end. The stator is a stationary, hollow cylinder lined with wire, which surrounds the rotor. The rotor rotates within the stator. The "stator winding" refers to the wire wound within the stator.

27

37.     While performing the Initial Repair Work, MD&A conducted a test, which revealed the existence of a defect in the generator's stator bars.  A "stator bar" is a series of copper conductor strands within the stator.

38.     In response to the discovery of a defect, APS issued a change notice request to MD&A dated March 17, 2003 (the "Change Notice Request").   By/In the Change Notice Request, APS solicited MD&A to locate and repair the defect.

39.     In response to APS' Change Notice Request, MD&A issued a change notice on March 19, 2003 (the "Change Notice").  The Change Notice amended MD&A's work scope to require MD&A to provide labor, equipment, and materials to remove and install 17 top bars and one bottom bar (the "Subsequent Repair Work").  The Change Notice required MD&A to begin performing the Subsequent Repair Work on March 19, 2003, and to complete the Subsequent Repair Work by April 7, 2003.

40.     The Change Notice did not specifically require MD&A to perform any tests as part of the Subsequent Repair Work.

41.     MD&A performed the Subsequent Repair Work, which it completed on or about April 19, 2003.

42.     On or about August 2, 2003, the generator suffered a catastrophic failure.  APS alleged that as a result of the failure, the generator was out of service for 111 days, forcing APS to incur costs to procure replacement power, in addition to the costs incurred due to the resultant property damage.

43.     On or about April 7, 2005, APS filed a complaint against MD&A in which APS alleged that MD&A's negligent repair work caused the generator to suffer a "catastrophic internal stator winding failure."

28

44.     The APS Complaint included counts against MD&A for strict liability, negligence, breach of contract, breach of express warranty, and breach of implied warranty.

45.     By its Complaint, APS sought to recover from MD&A the costs to repair the generator and other APS property, as well as the costs purportedly incurred by APS to procure replacement power from other sources while the generator was out of service.

**B.     Communication With Insurers**

46.     MD&A provided notice to Continental of the filing of the APS Complaint on or about May 23, 2005.

47.     Soon thereafter, Continental issued a letter to MD&A reserving its rights under its policy and applicable law to the extent that the lawsuit against MD&A did not fall within the Coverage Agreements of the Continental Policy ("Continental's Reservation of Rights"). Specifically, Continental reserved its rights on the basis that the APS Complaint consistently and almost exclusively alleged that MD&A's negligence (if any) arose out of the parts, equipment and repair services that MD&A provided to APS, as opposed to the performance of professional services as defined in/by the Continental Policy.

48.     Continental's Reservation of Rights also noted that the Continental Policy includes a Self Insured Retention of $250,000, for which MD&A is responsible, before Continental is required to assume any obligations.

49.     On or about October 18, 2006, Lexington issued a letter to MD&A reserving its rights to the extent that the lawsuit against MD&A did not fall within the coverage parameters of the Lexington Policy (the "Lexington Reservation of Rights").

50.     The Lexington Reservation of Rights also requested that MD&A place Continental (in connection with the Continental Policy) on notice of the APS Complaint, despite the fact that AIG/Lexington continued to control MD&A's defense.

51.     After receiving notice of the APS Complaint, AIG assumed and controlled the defense of MD&A in the Underlying Litigation pursuant to the terms of the Lexington Policy. In its sole discretion, AIG appointed defense counsel for MD&A and directed the strategy of MD&A's defense.

### THE EXPERT REPORTS

52.     Due to the complexity of the matters involved in the Underlying Litigation regarding the repair and later failure of the generator, the parties understood the importance of obtaining the analyses of experts regarding the salient issues. Thus, most of the discovery conducted in the Underlying Litigation consisted of expert reports concerning the potential cause of the generator's failure.

### A.     Initial Reports of APS' Experts

53.     In connection with the prosecution of the Underlying Litigation, APS retained two separate expert witnesses to opine as to the cause of the generator's failure.

54.     The conclusions in/of the reports prepared by these experts is that the direct and proximate cause of the generator's failure was MD&A's faulty workmanship. More specifically, APS's experts concluded that, had MD&A performed the repair work correctly, the generator would not have failed.

i.     **Initial Ward Report**

55.     Robert Ward ("Ward") of Ward Electric Service Corporation is a generator specialist who issued an expert report to APS, providing his opinion as to the cause of the generator's failure (the "Initial Ward Report").

56.     The Initial Ward Report concluded that the generator failed due to a fundamental defect in MD&A's assembly and soldering of the generator's connections in the Subsequent Repair Work, especially due to the existence of a gap between the copper strands and the cooling ducts.

57.     The Initial Ward Report contained the additional conclusion that the cause of the gap was the poorly fabricated connections.

58.     The Initial Ward Report alleged that MD&A should have conducted the Subsequent Repair Work without removing the stator bars.

59.     The Initial Ward Report referred generally to testing that Mr. Ward alleged MD&A should have been performed.

60.     Pertinent to this Declaratory Judgment Action, nowhere in his report does Mr. Ward assert that any acts or omissions by MD&A in its performance of professional services, as defined by the Continental Policy, caused the generator's failure.

ii.     **The Exponent Report**

61.     J.S. Edmonds of Exponent Failure Analysis Associates, Inc. ("Exponent") also provided an expert report to APS (the "Exponent Report"), providing his analysis of the cause of the generator's failure.  Mr. Edmonds specializes in the field of electric power generation.

62.     The Exponent Report concluded that, due to MD&A's Subsequent Repair Work, a gap between the end-winding groups of copper strands and the cooling ducts resulted in

31

overheating, causing the connections to fail. The Initial Exponent Report asserted that the cause of the gap was MD&A's poor construction and poor re-fabrication workmanship of the series connections.

63.     Pertinent to this Declaratory Judgment Action, nowhere in its report does Exponent assert that any acts or omissions by MD&A in its performance of professional services, as defined by the Continental Policy, caused the generator's failure.

**B.     Initial Reports of MD&A's Experts**

64.     MD&A, by and through Lexington (which was controlling MD&A's defense), itself retained three separate experts to opine as to the cause of the generator's failure. Significantly, all three of Lexington's/MD&A's own experts – like the two separate experts retained by the claimant in the Underlying Litigation – concluded that the cause of the generator's failure was the result of acts or omissions other than those that do or might fall within the definition of "professional services" in the Continental Policy.

**i.     The Landy Report**

65.     Charles Landy of Engineering Systems Incorporated provided an expert report to MD&A (the "Landy Report"). Mr. Landy specializes in the field of electrical engineering. In addition to providing a separate analysis, the Landy Report responded to the conclusions set forth in the reports issued by APS' experts.

66.     The Landy Report asserted that the problems started because the generator's insulation was damaged, which caused overheating. The Landy Report concluded that generator was damaged before MD&A did any repair work, and that MD&A would not have been aware of the damage.

67.     Pertinent to this Declaratory Judgment Action, nowhere in his report does Mr.

32

Landy assert that any acts or omissions of MD&A in its performance of professional services, as defined by the Continental Policy, caused the generator's failure.

### ii.    Initial Alan Spisak Report

68.    Alan Spisak of ElectroMechanical Engineering Associates Incorporated also provided a report to MD&A (the "Initial Alan Spisak Report"), providing his analysis of the cause of the generator's failure. Mr. Spisak is a mechanical engineer, specializing in the design, upgrading, and failure analysis of generators.

69.    The Initial Alan Spisak Report concluded that the likely cause of the breakdown was a fault in one of the stator bars. The report asserted that the major contributing factor to the fault was APS' infrequent inspection and maintenance of the generator.

70.    Pertinent to this Declaratory Judgment Action, nowhere in his report does Mr. Spisak assert that any acts or omissions of MD&A in its performance of professional services, as defined by the Continental Policy, caused the generator's failure.

### iii.    Initial Andy Spisak Report

71.    Andy Spisak of ElectroMechanical Engineering Associates Incorporated also provided a report to MD&A (the "Initial Andy Spisak Report") regarding the cause of the generator's failure. Mr. Spisak specializes in the field of engineering design and management on turbine generators.

72.    The Initial Andy Spisak Report stated that MD&A's work scope did not include additional inspection, but was based on a previous "crawl-through" inspection performed by another contractor. Therefore, the report maintained that there was no reason for MD&A to suspect any problems because extensive testing had been performed previously with no problems noted.

33

73.    The Initial Andy Spisak Report concluded that APS' failure to maintain and repair the generator resulted in its breakdown.

74.    The report contended that any assertion that MD&A failed to perform other necessary tests was without merit, stating that there was no evidence that such testing would have prevented the generator's failure.

75.    Pertinent to this Declaratory Judgment Action, nowhere in his report does Mr. Spisak assert that any acts or omissions by MD&A in its performance of professional services, as defined by the Continental Policy, caused the generator's failure.

**C.    Supplemental Reports By APS' Experts**

76.    Ward and Exponent provided the following reports to APS in response to the initial reports submitted by MD&A's expert (the "Supplemental APS Reports"). As was the case in/with their initial reports, the supplemental reports submitted by APS' experts did not assert that any acts or omissions by MD&A in its performance of professional services (as that term is defined in/by the Continental Policy) caused the generator to fail.

**i.    The Supplemental Ward Report**

77.    Ward issued a supplemental expert report to APS, providing his opinion regarding the initial reports submitted by MD&A's experts (the "Supplemental Ward Report").

78.    The Supplemental Ward Report asserted that MD&A's experts did not defend/deny the allegations of MD&A's poor workmanship.

79.    Mr. Ward maintained in his supplemental report that MD&A could have found the failure location without removing the bars, but that there was no evidence that MD&A attempted to locate the failure point and repair it without removing the bars.

34

80.    Pertinent to this Declaratory Judgment Action, nowhere in his report does Mr. Ward assert that any acts or omissions of MD&A in its performance of professional services, as defined by the Continental Policy, caused the generator's failure.

ii.    **The Supplemental Exponent Report**

81.    Exponent also issued a supplemental expert report in response to MD&A's expert reports (the "Supplemental Exponent report").

82.    Exponent maintained in its supplemental report that MD&A's experts did not defend/deny allegations of MD&A's poor workmanship, and that only MD&A's rebuilt connections failed, not the generator's original connections.

83.    Further, Exponent stated that MD&A's experts did not dispute the existence of a gap in the series connection, which Mr. Ward and Exponent alleged was a result of MD&A's faulty workmanship.

84.    Exponent maintained that the Subsequent Repair Work could have been performed without removing the bars.  Therefore, the connections did not need to be opened and re-soldered, and MD&A's faulty workmanship would not have left a gap between the connections and the cooling ducts, which caused the generator to overheat.

85.    Pertinent to this Declaratory Judgment Action, nowhere in its report does Exponent assert that any acts or omissions of MD&A in its performance of professional services, as defined by the Continental Policy, caused the generator's failure.

D.    **Supplemental Reports By MD&A's Experts**

86.    In response to the supplemental reports issued by APS' experts, MD&A provided additional reports from Alan Spisak and Andy Spisak.

i.      Supplemental Alan Spisak Report

87.     Alan Spisak provided a report to MD&A in response to the Supplemental APS Reports (the "Supplemental Alan Spisak Report").

88.     The Supplemental Alan Spisak Report countered Mr. Ward's and Exponent's assertions that APS had maintained the generator properly over the years.  Mr. Spisak opined that those reports failed to acknowledge the excessive looseness, wear and deterioration prior to the failure, and other evidence of poor maintenance.

89.     Pertinent to this Declaratory Judgment Action, Mr. Spisak did not conclude in his supplemental report that MD&A's professional services, as defined by the Continental Policy, caused the generator's failure.

ii.     The Supplemental Andy Spisak Report

90.     Andy Spisak issued a report for MD&A in response to the Supplemental APS Reports (the "Supplemental Andy Spisak Report").

91.     The Supplemental Andy Spisak Report countered the Supplemental Ward Report, asserting that the joints made by MD&A were perfectly functional.

92.     Mr. Spisak concluded in his supplemental report that APS did not properly monitor the generator's hot gas temperature detectors.

93.     Finally, Mr. Spisak explained that the repairs could not have been done without removing the bars.

94.     Pertinent to this Declaratory Judgment Action, nowhere in his report does Mr. Spisak assert that any acts or omissions of MD&A in its performance of professional services, as defined by the Continental Policy, caused the generator's failure.

36

95.     Consequently, the overwhelming weight of evidence elicited during discovery and in the expert reports leads to the inescapable conclusion that the generator did not fail due to any professional services (as defined in/by the Continental Policy) performed by MD&A, but rather as a result of negligence (if any) in connection with MD&A's repair work.

E.     **Settlement of the Underlying Litigation**

96.     The failure by MD&A and AIG ever to include Continental in the settlement process was entirely consistent with the approach of MD&A and AIG as they defended the lawsuit.

97.     Finally, MD&A and AIG did invite Continental to participate in a mediation scheduled for November 7, 2007.   Continental accepted the invitation and, subsequently, participated in the mediation to attempt to resolve the Underlying Litigation without the necessity of continued discovery and trial.

98.     At all times during the course of the November 7th mediation session and thereafter, Continental expressed both its willingness and eagerness either to resolve or to defer resolution of the coverage issues that had arisen between the insurers in order to resolve the Underlying Litigation and to protect the interests of MD&A.

99.     Continental's position regarding the coverage issues between and among the insurers was stated simply: it was necessary to allocate MD&A's potential liability to APS for the generator failure between MD&A's liability (if any) due to the performance of professional services (which potentially were covered by the Continental Policy), and MD&A's liability due to faulty workmanship (which potentially was covered by the AIG Policies).

100.     AIG's position regarding the coverage issues between and among the insurers was as follows: because, in its opinion, both the Lexington Policy and the Continental Policy

constitute underlying insurance to the National Union Policy, the Lexington and Continental Policies had to be exhausted before the National Union Policy was triggered. Further, AIG maintained that because it was of the opinion that it was impossible to allocate MD&A's potential liability, both the Lexington Policy and the Continental Policy must exhaust their limits before the National Union Policy is ever implicated.

101.    Despite Continental's disagreement with AIG regarding the coverage issues between and among the insurers, Continental proposed, among other things during the course of mediation, a funding mechanism that was designed to settle the Underlying Litigation, and mitigate entirely MD&A's exposure, while preserving for both insurers all rights as against each other.

102.    AIG rejected outright all of Continental's efforts to resolve the Underlying Litigation, including some proposals that would have had Continental fund a portion of a settlement payment to be made to APS.

103.    Instead, AIG unilaterally entered into settlement negotiations with APS without requesting the further involvement of Continental and without providing notice to Continental. Ultimately, AIG agreed with APS, absent Continental's knowledge or consent, to settle the Underlying Litigation for an amount substantially in excess of defense counsel's valuations.

104.    Notwithstanding the fact that Continental was not invited to participate in the settlement negotiation, Continental offered to contribute, and ultimately did contribute, one million dollars (an amount that AIG specifically requested from Continental) toward the settlement of the Underlying Litigation, while reserving all of its rights under the Continental Policy and applicable law, including the right to seek reimbursement of that amount from AIG.

**AIG'S POSITION WITH RESPECT TO COVERAGE**

105.    AIG maintains that the Continental Policy somehow is "underlying insurance" for purposes of the National Union Policy's Retained Limit provision, notwithstanding the fact that no professional liability policy was listed as underlying insurance, that MD&A was not required to obtain professional liability insurance for the APS project, and that the National Union Policy does not even provide professional liability coverage.    Accordingly, AIG asserts that the National Union Policy is "excess" to both the Continental Policy and the Lexington primary general liability policy and is, therefore, not implicated until both the Lexington Policy limits *and* the Continental Policy limits are completely exhausted, regardless of whether allocation among the Lexington Policy and the Continental Policy is possible.    AIG has taken this position notwithstanding the fact that the Continental Policy provides coverage for different and distinct risks than the National Union Policy.

106.    Further, AIG maintains that it is impossible to allocate MD&A's potential liability to APS for the generator failure between that which arises out of professional services (if any) from liability arising out of repair/construction services.    As such, AIG contends that the Lexington general liability primary policy and the Continental professional liability policy must tender their full policy limits before the National Union general liability Excess Policy is triggered.

**CONTINENTAL'S POSITION WITH RESPECT TO COVERAGE**

107.    Continental maintains that no allocation is required because the damages arose solely out of workmanship (*i.e.*, non-professional failures).

108.    Continental maintains that, to the extent that it is determined that both professional and non-professional liability gave rise to the damages, while it may be difficult to

allocate MD&A's potential liability to APS for the generator failure, it is not impossible. Indeed, it is Continental's position that allocation is required because the Lexington and Continental Policies provide coverage for separate and distinct risks. In particular, the Continental Policy provides coverage for professional liability, specifically excluding coverage for faulty workmanship, and the National Union Policy provides coverage for general liability, specifically excluding coverage for professional services.

109.    Additionally, MD&A bears the burden to establish what portion of the damages arose from professional liability and what portion of damages arose from non-professional liability.

110.    Furthermore, because the National Union and Continental Policies provide coverage for separate and distinct risks, they create discrete lines of coverage. Consequently, the National Union Policy is not "excess" to the Continental Policy. Therefore, it is not required that the Continental Policy be exhausted before the National Union Policy is triggered. Indeed, the two policies operate as part of two isolated coverage towers, neither implicating the other.

111.    As stated, the Continental Policy covers MD&A for only those amounts that MD&A becomes legally obligated to pay as a result of MD&A's negligent acts, errors or omissions in the performance of professional services, excluding coverage for amounts arising out of the cost to repair or replace due to MD&A's faulty workmanship. Thus, to the extent that the generator failed as a result of MD&A's faulty workmanship, the Continental Policy provides no coverage.

112.    In contrast, the AIG Policies provide coverage for general liability, excluding coverage for liability arising out of professional services. Thus, to the extent that the generator failed as a result of MD&A's faulty workmanship, the AIG Policies provide coverage.

113. Accordingly, because the policies cover distinct risks, the National Union Policy is not and cannot be excess to the Continental Policy, and exhaustion of the Continental Policy is not required to trigger the National Union Policy.

114. Furthermore, it is appropriate and absolutely necessary to allocate MD&A's liability to APS for the generator failure between MD&A's liability (if any) arising out of its performance of professional services (which potentially is covered by the Continental Policy), and MD&A's liability arising out of faulty workmanship (which is covered by the AIG Policies).

## AS AND FOR A FIRST COUNTERCLAIM
## AGAINST LEXINGTON INSURANCE COMPANY
## (DECLARATORY JUDGMENT)

115. Continental repeats and realleges each and every allegation set forth in paragraphs 1 through 114, inclusive, with the same force and effect as if fully set forth herein.

116. As described above, the Continental Policy, by and subject to its terms and conditions, provides coverage to MD&A for liability arising out of the performance by MD&A of professional services, and excludes coverage for liability arising out of MD&A's faulty workmanship, including any materials, parts or equipment furnished in connection therewith, and the design or manufacture of any goods or products which are sold or supplied by MD&A.

117. As described above, the Lexington Policy provides general liability coverage to MD&A, and excludes coverage for property damage "arising out of the rendering of or failure to render any professional services . . . ."

118. The evidence elicited at/by the time of settlement, as well as the reports generated by the experts for both MD&A and APS, have failed to demonstrate that the generator's failure was proximately caused by a negligent act, error or omission in the performance of MD&A's "professional services," as defined by the Continental Policy.

119.    The evidence and the expert reports demonstrate that APS' damages arose out of MD&A's faulty workmanship and not out of MD&A's rendering of or failure to render professional services. Therefore, the Continental Policy provides no coverage to MD&A related to the Underlying Litigation.

120.    However, in the unlikely event that the Court determines that both the Continental Policy and the AIG Policies provide coverage to MD&A, there must be a proper allocation of APS's damages between and among the general liability policies (the AIG Policies) and the professional liability policy (the Continental Policy) accordingly.

### AS AND FOR A FIRST COUNTERCLAIM AGAINST NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA (DECLARATORY JUDGMENT)

121.    Continental repeats and realleges each and every allegation set forth in paragraphs 1 through 120, inclusive, with the same force and effect as if fully set forth herein.

122.    As described above, the Continental Policy, by and subject to its terms and conditions, provides coverage to MD&A for liability arising out of the performance by MD&A of professional services, and specifically excludes coverage for liability arising out of MD&A's faulty workmanship, including any materials, parts or equipment furnished in connection therewith, and the design or manufacture of any goods or products which are sold or supplied by MD&A.

123.    The evidence elicited at/by the time of settlement, as well as the reports generated by the experts for both MD&A and APS, have failed to demonstrate that the generator's failure was proximately caused by a negligent act, error or omission in the performance of MD&A's "professional services," as defined in/by the Continental Policy.

42

124.    The evidence and the expert reports demonstrate that APS' damages arose out of MD&A's faulty workmanship and not out of MD&A's rendering of or failure to render professional services. Therefore, the Continental Policy provides no coverage to MD&A related to the Underlying Litigation.

125.    As described above, the National Union Policy is an umbrella policy, which provides general liability coverage to MD&A, specifically excluding coverage for liability arising out of MD&A's professional services.

126.    Accordingly, the National Union Policy and the Continental Policy insure MD&A against separate and distinct risks. Thus, the two separate and distinct lines of coverage are established: one providing coverage for damages caused by professional errors and one providing coverage for damages caused by non-professional errors. By definition and application, these two lines are mutually exclusive.

127.    Furthermore, the National Union Policy does not list the Continental Policy in its Schedule of Underlying Insurance.

128.    Therefore, the Continental Policy is not "underlying insurance" for purposes of the National Union Policy's Retained Limit provision, and the National Union Policy is not "excess" to the Continental Policy. Thus, the Continental Policy limits do not need to be exhausted before the National Union Policy is implicated.

129.    Indeed, assuming *arguendo* that MD&A's liability arose solely from its performance of professional services, the National Union Policy would not be triggered after the Continental Policy's limits were exhausted because the National Union Policy does not provide coverage for liability arising from professional services. In the same way, here, it is not required

43

that the Continental Policy be exhausted before the National Union Policy is triggered because, as stated, the policies provide coverage for separate and distinct risks. In sum, general liability insurance cannot be "excess" to professional liability insurance, particularly when, as here, each policy specifically excludes coverage for the very risks for which the other policy provides coverage.

**AS AND FOR A SECOND COUNTERCLAIM
AGAINST NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA
(BREACH OF CONTRACT)**

130.    Continental repeats and realleges each and every allegation set forth in paragraphs 1 through 129, inclusive, with the same force and effect as if fully set forth herein.

131.    AIG issued to MD&A the AIG Policies in exchange for good and valuable consideration.

132.    The evidence elicited at/by the time of settlement, as well as the reports generated by the experts for both MD&A and APS, demonstrate that APS' damages arose out of MD&A's faulty workmanship and not out of MD&A's rendering of or failure to render professional services. Therefore, the Continental Policy provides no coverage to MD&A related to the Underlying Litigation. Rather, the AIG Policies provide coverage to MD&A for the Underlying Litigation.

133.    Despite Continental's efforts to negotiate with APS to conclude a settlement that would have required payment to APS of an amount of money that was substantially less than the amount that AIG ultimately (and unilaterally) agreed to pay, National Union/AIG wrongfully, without consultation or reason, entered into a settlement agreement with APS for an amount substantially in excess of defense counsel's pre-mediation evaluation of MD&A's exposure.

44

Thereafter, National Union/AIG demanded that Continental contribute one million dollars to the settlement, despite the fact that MD&A's negligence (if any) arose out of the parts, equipment and repair services that MD&A provided to APS, not any professional services, as that term is defined in/by the Continental Policy.

134.    In an effort to protect the interests of MD&A, Continental accepted AIG's demand and contributed one million dollars to the settlement with an express reservation of rights, including the right to seek reimbursement of that amount from AIG.

135.    The failure of National Union to perform its contractual obligation to provide indemnification to MD&A constitutes a breach of the National Union Policy.

136.    Continental issued the Continental Policy to MD&A in reliance on the fact that the AIG Policies provided coverage to MD&A for general liability. Thus, Continental is a third-party beneficiary of the contracts of insurance that AIG issued to MD&A.

137.    As a direct and consequential result of National Union's breach of its contractual obligation to indemnify MD&A, Continental, as a third-party beneficiary of the AIG Policies and as subrogee to the rights of MD&A, suffered significant losses in the interest of protecting the interests of MD&A in the settlement of the Underlying Action.

138.    Thus, Continental is entitled to reimbursement from National Union of the one million dollars that Continental contributed toward settlement of the Underlying Action.

**AS AND FOR A THIRD COUNTERCLAIM
AGAINST NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA
(EQUITABLE SUBROGATION)**

139.    Continental repeats and realleges each and every allegation set forth in paragraphs 1 through 138, inclusive, with the same force and effect as if fully set forth herein.

140.    As a result of National Union's failure to fully indemnify MD&A for the Underlying Litigation, Continental was required to make significant payments to resolve the claim asserted against MD&A.

141.    As a result of National Union's breach, Continental is entitled to recover from National Union the one million dollars that Continental contributed to the settlement of the Underlying Litigation as a result of National Union's bad faith failure to fully indemnify MD&A for the Underlying Litigation.

**AS AND FOR A FOURTH COUNTERCLAIM
AGAINST NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA
(QUANTUM MERUIT/UNJUST ENRICHMENT**

142.    Continental repeats and realleges each and every allegation set forth in paragraphs 1 through 141, inclusive, with the same force and effect as if fully set forth herein.

143.    As a result of National Union's failure to fully indemnify MD&A for the Underlying Litigation, Continental was required to make significant payments to resolve the claim asserted against MD&A.

144.    As a result of National Union's failure to fully indemnify MD&A for the Underlying Litigation, Continental was required to make significant payments to resolve the claim asserted against MD&A.

46

145.    As a result of National Union's breach, National Union received a significant benefit under circumstances that would make it unjust for National Union to retain this benefit without reimbursing Continental for amounts it incurred in the settlement of the Underlying Litigation.

**WHEREFORE**, Continental requests that this Court enter judgment:

A.    Declaring that APS's damages did not arise out of the performance or omission by MD&A of "professional services," as defined by the Continental Policy;

B.    Declaring that MD&A was not entitled to coverage under the Continental Policy for APS's claims against MD&A and, therefore, Continental did not have any obligation to defend or indemnify MD&A in connection with the Underlying Litigation;

C.    Declaring that, if the Court determines that both the Continental Policy and the AIG Policies provide coverage to MD&A, allocation between and among the Lexington Policy, National Union Policy and the Continental Policy is necessary and appropriate;

D.    Declaring that the Continental Policy is not "underlying insurance" for purposes of the National Union Policy's Retained Limit provision;

E.    Declaring that the National Union Policy is not "excess" to the Continental Policy;

F.    Declaring that the Continental Policy's limits do not have to be exhausted before the National Union Policy is triggered;

G.    Declaring that National Union is obligated to reimburse Continental the one million dollars that Continental contributed toward the settlement of the Underlying Litigation; and

H.    Granting such other and further relief as this Court deems appropriate and just under the circumstances.

I.    Denying the relief sought by Plaintiffs in the Amended Complaint;

J.    Awarding Continental its attorneys' fees and costs incurred in defending this action; and

47

K.    Such other relief as this Court may deem just and proper.

Dated: New York, New York
       May 23, 2008

CARROLL MCNULTY & KULL LLC

BY:  Christopher R. Carroll (CC 0300)
Attorneys for Defendant Continental
       Casualty Company
570 Lexington Avenue – Tenth Floor
New York, New York  10022
(212) 252-0004
ccarroll@cmk.com

48